**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | |
|---|---|
| **GREEN DIM,** | |
| **Plaintiff,** | **Case No. 2:12-cv-801** |
| **v.** | **Judge Peter C. Economus** |
| **THE HUNTINGTON NATIONAL BANK,** | **Magistrate Judge Mark R. Abel** |
| **Defendant.** | **MEMORANDUM OPINION AND ORDER** |

Presently pending before the Court is Defendant the Huntington National Bank's Motion for Summary Judgment (Doc. 33). For the reasons that follow, the motion is **GRANTED in PART** and **DENIED in PART**.

## I.

Plaintiff Green Dim brings the instant action against Defendant the Huntington National Bank ("Huntington") with claims for race, national origin, and age discrimination under federal and Ohio law. Dim's claims arise from his employment with and subsequent termination by Huntington.

## A.

The record developed during discovery and cited by the Parties reveals the following: Dim was born in Nigeria in 1952 and has lived in the United States since 1975. (Dim Dep. 17.) He is black. (*See* Dim. Dep. 278.) Dim has worked in the banking industry for over 30 years and has developed an expertise in "workout," a process involving troubled loans. (Dim. Decl. ¶ 3.) According to him:

> Workout is the managing of a bank's distressed loans, often referred to as "special assets." Workout is a function distinct from that of the lending side of a bank, often referred to as the "Line". Loans made by the Line are transferred to workout once they become special assets. The function of workout is to either rehabilitate the customer (creditor) and return it to the Line or if that is not feasible, terminate the relationship with the customer and maximize the bank's recovery or minimize the bank's loss on its loan.

(Dim. Decl. ¶ 3.)

Dim was hired by Huntington in November 2009. Prior to his hire, he had worked at Citizens Bank of Pennsylvania in Philadelphia starting in 2004. (*See* Green Dep. Ex. 1 at 1.) Several individuals, including Fred Manning, who would ultimately make the decisions to both hire and fire Dim, Bill Harris, and Tom Opie, had also worked at Citizens Bank prior to working for Huntington. (*See* Green Dep. 42; 57–60.) When Dim began his employment with Huntington, he initially reported directly to Ralph Parker, who in turn reported to Harris, who in turn reported to Manning. (Dim Dep. 71.) Manning reported to Dan Neumeyer, Huntington's Chief Credit Officer, and Neumeyer reported to Steve Steinour, the Chief Executive Officer. (*See* Manning Dep. 13–14.) Following Parker's departure from Huntington, Dim began to report directly to Opie, a special assets team leader. (Opie Dep. 12.)

Manning had joined Huntington in February 2009 as the Executive Vice President and Managing Director of the Special Assets Division, the position he held at the time Dim was terminated. (Manning Dep. 8.) Harris is the C&I (Commercial and Industrial) Director in Huntington's Special Assets Division. (Harris Dep. 7.) Dim first contacted Harris about possible opportunities at Huntington. (Dim Dep. 66.) Harris informed him about a position in Columbus, but, according to Dim, Harris told him that he would have to talk to Manning about the position because of the terms of Harris' severance agreement with Citizens Bank. (Dim Dep. 69.) Dim then contacted Manning, who arranged an interview. (Dim Dep. 70.)

In 2009, Huntington was in a hiring freeze, so the decision to hire someone at Dim's level had to be approved by Steinour. (Manning Dep. 105.) Manning had personally observed Dim being "overly tough on customers" when they had worked together previously and believed that Dim had such a reputation. (Manning Dep. 36.) According to Manning:

> When [Steinour and I] spoke about Mr. Dim, he and I both expressed some reservation with his history of being hard on customers, and we agreed that we

would extend him an offer, but he wanted someone to have a very specific conversation with him about how he was to conduct business at Huntington, and that was it.

(Manning Dep. 105.)   Steinour testified that he became aware of Dim's reputation while at Citizens Bank.   (Steinour Dep. 50.)   Manning later claims to have discussed the situation with Harris:

> I explained to Mr. Harris that he would need to make it clear and counsel Mr. Dim that he could not manage lending relationships, all lending relationships harshly. I believe the term I used was he couldn't be a grinder, and that he needed to counsel Mr. Dim that his employment was based upon him not being overly tough on customers when the circumstances didn't require it, and this was because of Mr. Dim's reputation, which for me goes back to the late 80s, early 90s, when both Mr. Dim and I were employed by, in my case, Shawmut, Mr. Dim's case, Mellon.

(Manning Dep. 36.)   Harris testified that after his conversation with Manning, he spoke with Dim regarding Steinour's concerns:

> I believe we sat down in Columbus on one of his interviews and we discussed it, and I told him about the concerns, and I told him that if he came in, he had to do things by the book, follow his documents.   And I told him there was concern about how he dealt with customers.

(Harris Dep. 59.)

According to Dim, Manning asked him to join the team at Huntington "because he felt that these people here do not know what to do in workout, and are not trained or set up to do workout."   (Dim Dep. 71–72.)   Dim denies interviewing with Harris for the position.   (Dim Decl. ¶ 4.)   He further denies ever being warned by any member of Huntington management, including Harris, either before, during, or after his interviews, that his approach, style, or methods to workout situations or the way he interacted with customers at previous banks was contrary to Huntington's policies.   (*See* Dim Dep. 80–81; Dim. Decl. ¶ 6.)   Further, Dim contends that "[a]t no time before I was terminated did Manning, Opie or Harris, or anyone else in management, ever warn me that I was not performing or behaving satisfactorily with respect to any of the

Bank customers." (Dim Decl. ¶ 19.) According to Dim, if such warnings had been given, they would have been contrary to the aggressive style of workout favored by Manning, Harris, and Opie. (*See* Dim Dep. 80–81.) Opie testified that he never told Dim that Dim "would have to soften his approach" to dealing with customers, nor was he ever told to do so by Harris or Manning. (Opie Dep. 64.)

**B.**

Dim received excellent performance evaluations during his time at Huntington, and Manning was aware of that fact when he made the decision to terminate Dim's employment. (Manning Dep. 92. *See* Opie Dep. Exs. 3–5.) His 2010 performance review lists as a strength the fact that "Green fosters a very strong working relationship with his borrowers, while letting them know he is in charge of the situation." (Opie Dep. Ex. 4 at 2.) The summary section of the review further states that "Green … deals firmly but fairly with his borrowers and keeps senior management in the loop." (Opie Dep. Ex. 4 at 6.) During his time at Huntington, Dim received the maximum performance bonuses for which he was eligible. (Dim. Decl. ¶ 7.)

Prior to the events leading to his termination, Harris was satisfied with Dim's performance. (*See* Harris Dep. 32.) He further testified that at no time prior to Dim's termination did he "conclude that Mr. Dim had, in fact, interacted with customers in a way that was inconsistent with what you told him would be expected of him during this interview." (Harris Dep. 74.) Opie testified that had he been asked for his opinion, he would have disagreed with the decision to terminate Dim's employment. (*See* Opie Dep. 55.) According to Opie, he disagreed with the decision because "I appreciated [Dim]'s work and his allegiance and his contributions." (Opie Dep. 57.)

## C.

Huntington contends that Dim's termination in January 2012 was the result of complaints received from several customers regarding his conduct. Huntington had a sizable banking relationship with Arbenz, a company doing business under the name Edwards Steel. (*See* Steinour Dep. 9; Manning Dep. 40.) Dim was not originally assigned to the Edwards Steel account but began working on it after Mark Lorenz was promoted to become a team leader. (Dim Dep. 180.) In April 2011, oral agreements were reached between Edwards Steel and Huntington concerning the winding down of the business relationship between the two entities. (*See* Manning Dep. 53.) The meeting at which the agreements were reached occurred before Dim was assigned the Edwards Steel account and involved Opie, Lorenz, Huntington Legal Counsel Eric Stoller, Dave Edwards, President of Arbenz/Edwards Steel, and his legal counsel Rick Stovall. (*See* Dim Dep. Ex. 7.)

Dim was subsequently transferred to the account, but, according to Manning, in the period after the oral understanding was reached but before a written agreement could be executed, he refused to recognize the agreement. (Manning Dep. 54.) On September 16, 2011, Edwards sent a memorandum to Manning detailing the situation. (*See* Dim Dep. Ex. 7.) In the memorandum, Edwards stated:

> Since April, 2011, Mr. Stoller has indicated that he has a draft of the definitive agreement to share with us but apparently has been precluded from doing so at the request of Mr. Green Dim. At some point following our April discussions and agreement, Mr. Dim took over this file. Mr. Dim, who was not present at any of our prior meetings or discussions in March or April, 2011, has repeatedly insisted that there is no agreement in place.

(Dim. Dep. Ex. 7.) Edwards also contacted Don Casto, who has been a member of Huntington's Board of Directors since 1985. (Casto Dep. 8, 15–22.) According to Casto, Edwards requested that he get involved in the situation as Edwards felt that Huntington was not honoring the oral

agreement and that he was being treated very poorly. (Casto. Dep. 19–20.) During the conversation, Dim's name was mentioned. (Casto. Dep. 20.) Although Casto does not recall the specific words used by Edwards, he testified that Edwards indicated that the poor treatment was coming from Dim. (Casto Dep. 30–31.) According to Casto, Edwards said something along the lines of "In my entire business career, I don't think I've ever been treated in a manner like Mr. Dim and the Huntington has treated me." (Casto. Dep. 29.) Casto then contacted Jim Kunk, Huntington's Regional President in charge of customer relationships in the Columbus area to discuss the situation. (Casto Dep. 33.) Kunk in turn spoke to Manning regarding Edwards' complaint. (*See* Manning Dep. 78.) Manning attended a meeting with Edwards Steel regarding the situation. (Manning Dep. 40, 86–87.)

According to Dim, the oral agreement with Edwards Steel had not been properly approved by Huntington, and was therefore not in force. (*See* Dim Dep. 186–87, 190.) Further, Opie defended Dim's conduct toward Edwards Steel, testifying that "Dave Edwards was extremely difficult to deal with" and that the negotiations with Edwards were "like pulling teeth." (Opie Dep. 66–67.)

Another complaint related to Dim's work with the Anthony Thomas Candy Company ("Anthony-Thomas"). The Anthony-Thomas account was transferred to the Special Assets Division because the company had indicated that it might not have enough cash to meet payroll obligations. (*See* Opie Dep. 35–36.) Opie testified that the Zanetos family, the owners of Anthony-Thomas, were not happy that management of the account had been transferred to Dim and himself. (*See* Opie Dep. 38–39.) When Opie and Dim arrived at the initial meeting with Anthony-Thomas in May 2010, they learned that Joe Zanetos, the company's president, was vacationing in the Bahamas. Given the dire circumstances faced by the company, Opie indicated that either he or Dim "expressed our displeasure that the president of the company wasn't there."

(Opie Dep. 74–75.)  According to Dim, Opie used the "F-word" loudly to express his anger and frustration that Zanetos was not at the meeting."  (Dim Decl. ¶ 8.)

In December 2011, having weathered its financial difficulties, Anthony-Thomas decided to end its relationship with Huntington.  In an email sent by Dim to Manning, Opie, and others dated December 6, 2011, Dim described a phone call he received from Zanetos in which Zanetos informed Dim of the decision.  (*See* Dim Dep. Ex. 11.)  Manning responded to Dim with the following:

> Green,
>
> In retrospect, I wouldn't change a thing in how we handled the credit.  If, for whatever reason, they lose the Mars contract again, the company will be back in trouble.  Mission accomplished.
>
> Fred

(Dim Dep. Ex. 11.)  When asked to describe what he meant by "mission accomplished," Manning testified that "[a]s long as you don't trash the reputation of the bank, getting a full payoff is an acceptable resolution."  (Manning Dep. 70.)  Harris responded to Manning's email stating, "Its [sic] hard to say Boo to to [sic] defaulted borrowers anymore without getting this reaction.  I'm really not sure what we can do about it."  (Harris Dep. Ex. 17.)

Prior to the receipt of the Zanetos email and prior to the "mission accomplished" email, Manning had been aware of "issues in the relationship between the bank and [Anthony-Thomas]" and had attended a tense meeting in March 2011 where he attempted to defuse the situation.  (Manning Dep. 70, 88.)  According to Manning, the situation had to be defused partly because of Dim's behavior, but, after the meeting, he did not speak to Dim about his concerns.  (Manning Dep. 89.)  Zanetos had requested the meeting to change the terms of the lending relationship between Huntington and Anthony-Thomas.  (Dim Decl. ¶ 12.)  Prior to the meeting, Opie had sent an email to Manning in which he described Zanetos as being "brutal" in his

negotiations with the bank.  (*See* Opie Dep. Ex. 9.)

On December 16, 2011, Zanetos sent an email to Steinour, Kunk, Manning, and Casto with the subject line stating "Anthony-Thomas departure from Huntington".  (Zanetos Dep. Ex. 43.)  The email generally details the souring of the relationship between Huntington and Anthony-Thomas and describes the involvement of Dim and Opie:

> …
>
> Well, I went to the Bahamas and I got a call from my brother saying that a Tom Opie and Green Dim were here and that they are now in charge of running our company.  They will be bringing in auditors in the morning to start going over our books and they will tell us who can be paid and who cannot.  I was flabbergasted to say the least.  When I returned from my trip it was explained to me that the bank had lost confidence in us and that more than likely they will be liquidating our business.
>
> The reason I was given was because we could not meet payroll and the bank considered that the last thing before a company goes under.  WE never said that we could not meet payroll.  If the bank had informed us that they could not advance us any further funds, we would have put our own money in the company to keep it going.  In fact, that is what happened.  We continued to operate with our own money.
>
> We had furnished Huntington with projections going forward which showed that by fall we would be back on sound ground and starting to turn things around.  Green Dim would have nothing to do with that.  He did not believe it and said many times, that if it were his decision alone, he would liquidate the company.  With everything that is going on in the economy, here is a company employing over 200 people with a plan to keep it going and Green Dim wants to liquidate it.
>
> So, what does Huntington do?  For the next 9 months they have auditors, appraisers, attorneys and accountants run up more expenses instead of seeing how they can help us.  In the meantime we are exceeding our projections and it is obvious that we are turning things around.  What does Green Dim want to do?  He still says the bank is wasting its time and should be liquidating the company.  At that point I made a phone call to Jim Kunk who I met at a Huntington affair and pleaded my case.  He had Fred Manning give me a call and we agreed on meeting.  The meeting resulted in Huntington refinancing our debt, which took place in March.  At the closing Green Dim reiterated to all that had he had his way, he still would have liquidated the company and doubted rather [sic] we would make it or not.
>
> Between May of 2010 and November of 2011 including the auditors, attorneys,

accountants, appraisers, penalties and higher interest costs, the Anthony-Thomas Candy Company incurred [redacted]. In addition we were insulted, ridiculed and implied that we were incompetent. When I called Green Dim to tell him we were leaving the bank, he stated that he had saved our company and this was the thanks that he was getting. How arrogant. Our business could have been salvaged by Huntington if it had been handled right. I mentioned to Green that he did not even know who we were or anything about our company. He said it doesn't matter, that he doesn't need to know anything about a company that the financials tell him everything he needs to know. It's a shame that the world has come to this.

(Zanetos Dep. Ex. 43 at 2.)

Zanetos testified that Dim was the person at Huntington with whom he had the most contact, and clarified that when he spoke of being insulted and ridiculed in his email to Huntington management, he meant that it was Dim who had insulted and ridiculed Anthony-Thomas. (Zanetos Dep. 31, 42.) As to the specific behavior that Zanetos considered insulting and ridiculing, he testified that Dim did not like Anthony-Thomas' business model, made suggested changes to the company's accounting systems, and, that on many occasions, Dim indicated that he did not believe the company would survive or that Dim would be liquidating the company one day. (*See* Zanetos Dep. 42–44.) Dim denies ever suggesting to anyone, including Zanetos, that Anthony-Thomas should have been liquidated. (Dim Decl. ¶ 11.) According to him, he had recommended that the company's account be upgraded and sent back to the "line." (Dim. Dep. 214.)

Manning forwarded Zanetos email to Neumeyer, stating that:

The following email from Joe Zanetos was sent to Steve and Don Casto.

Tom Opie is out on PTO today. I will review the allegations with both Tom and Green.

I met Joe Zanetos and his brother just after the first of the year. They seemed like decent people, but very unsophisticated.

There is no question that Joe Zanetos didn't like paying for appraisals, legal fees and higher pricing. I actually agreed to eat the cost of the last real estate

appraisal, after Joe called me to complain.

There is also no question that the business came very close to failing, after Mars pulled back. Advantage Bank refinanced us last week. Both Rish and Smith landed at Advantage.

(Manning Dep. Ex. 27.) Casto forwarded Zanetos' email to Kunk at 10:25 p.m. on the evening of December 16, 2011 with the following message; "Is the Green Dim the same guy who was tormenting Dave Edwards? Dave told me stories that were deeply unpleasant if true. This letter reinforces Dave's experience. We may have a problem here." (Manning Dep. Ex. 28.) On December 17, 2011 at 5:38 p.m., Steinour sent an email to Neumeyer regarding the Zanetos email, stating, "I am very upset by this note. I have spoken to [Manning] in the past re Green and have been assured counseling has occurred. If true, this will require action. Let's talk about it on Monday." (Neumeyer Dep. Ex. 33.)

### D.

Manning's decision to terminate Dim's employment was made within a few days of the receipt of Zanetos' email. Neumeyer and Manning discussed the email and considered it a serious problem. (*See* Neumeyer Dep. 23; Manning Dep. 59.) According to Neumeyer, customer complaints are taken seriously by Huntington, especially when they are made to Steinour and/or members of the board. (Neumeyer Dep. 24.) On Monday, December 19, 2011, Steinour, Neumeyer, and Manning discussed the customer complaints against Dim following a regularly scheduled meeting. (*See* Manning Dep. 60–61; Steinour Dep. 28–30; Neumeyer Dep. 34.) Neumeyer testified that, during the meeting, Steinour asked Manning for information regarding the Zanetos complaint "to gain an understanding of the situation." (Neumeyer Dep. 35.) According to Manning, at the meeting, Steinour produced a copy of the complaint and asked Manning "what [he] was going to do about it." (Manning Dep. 60–61.)

Steinour, Neumeyer, and Manning concluded that it was "likely" that Zanetos had not

been treated appropriately by Dim. (Neumeyer Dep. 39–40.) Neumeyer testified that Steinour and Manning's "prior history" with Dim was discussed at the meeting, and that Manning felt that there was merit to Zanetos' complaint. (*See* Neumeyer Dep. 45–46.) Neumeyer also testified that Steinour mentioned the fact that Dim had been counseled about dealing with customers prior to being hired. (*See* Neumeyer Dep. 49–50.) At the meeting, Manning ultimately made the decision to terminate Dim's employment and Steinour agreed with the decision. (Neumeyer Dep. 57–58; Manning Dep. 61.) According to Manning, he made the decision in order to "protect the bank from further reputational damage." (Manning Dep. 83.)

Also on Monday, December 19th, Dim wrote a lengthy email to Opie and Harris defending himself against the allegations in Zanetos' email. (*See* Dim Dep. Ex. 15.) In the email, he stated, "Obviously, [Zanetos] is doing his best to damage my reputation or get me fired." (Dim Dep. Ex. 15 at 1.) He then went on to explain why his and Huntington's actions regarding Anthony-Thomas' line of credit were inconsistent with Zanetos' assertion that Dim frequently talked about wanting to liquidate the company. *See* Dim Dep. Ex. 15. Harris responded to Dim's email with the following message, "Thanks Green. We did the right thing here. Bill." (Dim Dep. Ex. 17 at 1.) In discussions with Manning regarding the complaint, Harris further indicated that Zanetos was not the easiest customer with whom to work. (Manning Dep. 34.) Opie also defended Dim in an email to Harris, stating, "Several of the comments from Mr. Zanetos are out of line at best" and "we handled this relationship with kid gloves." (Dim Dep. Ex. 16 at 1.)

Dim's email, along with Opie's response were forwarded to Manning by Harris. (*See* Manning Dep. Ex. 29.) Manning forwarded the emails to Neumeyer, with the message, "In the interest of full disclosure, I provide the email string below for your information. It doesn't change the call I made this morning. In some respects, it reinforces the decision." (Manning

Dep. Ex. 29.)  According to Manning, Dim's email defending himself indicated that Dim did not understand that the way he had interacted with Zanetos was inappropriate.  (Manning Dep. 84.)  On December 23, 2011, Dim sent a detailed memo to Opie, Harris, and Manning similarly defending his conduct against the accusations in Zanetos' email.  (*See* Dim Dep. Ex. 18.)

Manning chose to terminate Dim rather than pursue a lesser form of disciplinary action because Dim had been purportedly warned by Harris prior to his hire and because of what Manning considered to be a pattern of Dim not following the warning.  (*See* Manning Dep. 86–87.)  Although Huntington adheres to a policy of "progressive discipline," according to Helen Marozzi, a Huntington Human Resources Business Partner, individual steps do not necessarily have to be followed in order.  (*See* Marozzi Dep. 11–12.)

Dim was out of the office from December 22, 2011 through January 16, 2012, but was informed of his termination upon his return at a meeting on January 17, 2012.  (*See* Manning Dep. Ex. 30.)  According to a memorandum describing his meeting with Dim on that day, Manning informed Dim "that the decision was based upon his interactions with customers, which have not been consistent with the image the bank wants to project in the community."  (Manning Dep. Ex. 30.)  Dim testified that Manning told him at the meeting that "we have to let you go.  The image you are portraying in the marketplace is not the image the bank wants portrayed, and I—and he goes, case in point, Anthony-Thomas.  That's the only name he gave me."  (Dim. Dep. 222.)

## II.

Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of "informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to

interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrates the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting prior version of Fed. R. Civ. P. 56). The movant may meet this burden by demonstrating the absence of evidence supporting one or more essential elements of the non-movant's claim. *Id.* at 323–25. Once the movant meets this burden, the opposing party "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation and citation omitted).

"In considering a motion for summary judgment, the Court must view the facts and draw all reasonable inferences therefrom in a light most favorable to the nonmoving party." *Williams v. Belknap*, 154 F. Supp. 2d 1069, 1071 (E.D. Mich. 2001) (citing *60 Ivy Street Corp. v. Alexander*, 822 F.2d 1432, 1435 (6th Cir. 1987)). The purpose of summary judgment "is not to resolve factual issues, but to determine if there are genuine issues of fact to be tried." *Abercrombie & Fitch Stores, Inc. v. Am. Eagle Outfitters, Inc.*, 130 F. Supp. 2d 928, 930 (S.D. Ohio 1999). Ultimately, this Court must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

## A.

As a preliminary matter, Dim has failed to offer evidence tending to establish that he was subject to discrimination when passed over for promotions, (see, e.g., Am. Compl. ¶ 46), nor has he contested Huntington's argument that summary judgment should be awarded to it as to such theories of recovery. Accordingly, summary judgment is granted to Huntington to the extent Dim's claims arise from purported discrimination in failing to promote him.

**B.**

Dim contends that the termination of his employment with Huntington constituted improper discrimination based on his race and/or national origin. His claims for recovery on this theory arise under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.*, the Ohio antidiscrimination statute, Chapter 4112 of the Ohio Revised Code, and 42 U.S.C. § 1981. Race/national origin discrimination claims brought under the Ohio statute and § 1981 are analyzed under the same legal standards applicable to Title VII claims. *See Jackson v. Quanex Corp.*, 191 F.3d 647, 658 (6th Cir. 1999) (claims for race discrimination under § 1981 analyzed under same standards as Title VII claims); *Ohio Civil Rights Comm'n v. David Richard Ingram, D.C., Inc.*, 630 N.E.2d 669, 672 (Ohio 1994) (citations omitted).

In cases such as this where there is no direct evidence of discrimination, a plaintiff may still prove a claim of discrimination using indirect and circumstantial evidence. Such claims are analyzed under the familiar burden-shifting framework announced by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). Under this analysis, if a plaintiff establishes a prima facie case of discrimination, the plaintiff "receives the benefit of a presumption that the employer unlawfully discriminated against him." *DiCarlo v. Potter*, 358 F.3d 408, 414 (6th Cir. 2004) (citing *Tex. Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). The burden then shifts to the defendant-employer "to articulate some legitimate, nondiscriminatory reason" for the employment action in question. *McDonnell Douglas*, 411 U.S. at 802. Finally, "should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." *Burdine*, 450 U.S. at 253. The ultimate burden of establishing that discrimination occurred remains with the plaintiff throughout the analysis. *Id.*

14

A plaintiff may establish a prima facie case of Title VII discrimination by "demonstrating (1) that he is a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a similarly-situated employee outside the protected class or classes was treated more favorably than he." *Dodd v. Donahoe*, 715 F.3d 151, 156 (6th Cir. 2013) (quotation omitted). "The burden of establishing a prima facie case of disparate treatment is not onerous." *Burdine*, 450 U.S. at 253.

Huntington argues that it is entitled to summary judgment as to Dim's claims for race/national origin discrimination because Dim is unable to make out a prima facie case of discrimination. Specifically, while assuming *arguendo* that Dim is able to establish the first three elements of a prima facie case, it contends that Dim is unable to point to any evidence from which a reasonable jury could conclude that a similarly situated employee outside of his protected class was treated more favorably than him by Huntington.

A plaintiff can establish the final element of a prima facie case if he can show "that for the same or similar conduct he was treated differently than similarly-situated non-minority employees." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). In determining whether employees are similarly situated, the Sixth Circuit has stated that district courts:

> should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in [*Pierce v. Commonwealth Life Ins. Co.*, 40 F.3d 796 (6th Cir. 1994)], the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects." *Pierce*, 40 F.3d at 802 (emphasis added).

*Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998).

Construing the record in a light most favorable to Dim and keeping in mind that his burden in establishing a prima facie case is not onerous, the Court concludes that Dim has

pointed to at least some evidence suggesting that a similarly situated employee outside of his protected class was treated more favorably than he. In this regard, Dim cites the deposition transcript of his supervisor, Thomas Opie. Opie is Caucasian and testified concerning an occasion where a customer (or the wife of a customer) complained to Neumeyer that Opie was being "a little aggressive" in dealing with the customer. (Opie Dep. 47–48.) According to Opie, Manning became aware of this complaint and spoke to him about it, but Opie received no discipline. (*See* Opie Dep. 50.)

In the Court's view, Opie and Dim are similarly situated in all relevant respects because both work in Huntington's Special Assets Division performing workouts of troubled loans, both were ultimately supervised by Manning, and customer complaints of which Manning was aware were received as to both. Opie, who is Caucasian, was treated more favorably than Dim in that, while Dim was terminated, Opie received absolutely no discipline. Accordingly, it is possible to infer that Dim's race and/or national origin were a factor in his termination. While it is true that Opie is a higher level employee than Dim, that fact only serves to strengthen the potential inference of impermissible discrimination. In this regard, it is reasonable to presume that Huntington would have higher expectations in terms of behavior and decorum for higher-level employees/executives.

Huntington asserts that Opie and Dim cannot be similarly situated because the complaint lodged against Opie was oral and communicated in an informal setting whereas Dim was subjected to several "formal," written complaints. However, the Court concludes that this difference is not relevant to the comparison between Opie and Dim as Huntington has failed to explain why an oral report of over-aggressive behavior would not still have the potential to damage the reputation of the bank. Similarly, the fact that complaints about Dim reached Steinour and Casto is not relevant to the comparison between Dim and Opie given that

Neumeyer, who received the complaint concerning Opie, is Manning's supervisor and only one step in the chain of command below Steinour. Finally, while it is also true that the record reflects only one complaint against Opie versus multiple complaints against Dim, the compelling factor in the Court's comparison of the two is that Opie received no discipline at all given how seriously Huntington purports to treat customer complaints received by high-level executives and potential threats to the bank's reputation.

Having concluded that Dim can establish a prima facie case of discrimination based on race and/or national origin, the Court also concludes that Huntington has articulated a legitimate, non-discriminatory reason for terminating Dim's employment. It is undisputed that complaints were received concerning Dim's interactions with customers. These complaints facially had nothing to do with Dim's race or national origin, and, according to Manning, they were the reason why Dim was terminated. The Court must therefore next consider whether Dim has identified evidence from which a reasonable jury could conclude that Manning's articulated reason for the termination is merely a pretext for discrimination.

A plaintiff may establish pretext "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256. "A plaintiff will usually demonstrate pretext by showing that the employer's stated reason for the adverse employment action either (1) has no basis in fact, (2) was not the actual reason, or (3) is insufficient to explain the employer's action." *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 393 (6th Cir. 2008). "However, the plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation." *Id.* (quotation omitted).

Here, there is ample evidence from which a reasonable jury could conclude, at the very least, that the proffered reason for Dim's termination is insufficient to explain Manning's decision. This evidence includes, but is not limited to the following: First, the Court notes evidence in the record concerning the tension and conflict that can accompany workout situations. (*See* Harris Dep. 80 ("tough decisions and tough meetings", "[customers] are not always happy").) Along these lines, Dim testified that his superiors at Huntington, including Manning, favored an aggressive approach to the workout process. Second, there is evidence that Opie was also aggressive in his methods with dealing with customers, including the complaint made to Neumeyer and Dim's testimony that Opie used expletives to express frustration with the fact that Zanetos was on vacation while Anthony-Thomas was in serious financial trouble. From these first two lines of evidence, a jury could conclude that being aggressive toward customers is a normal part of the workout process.

Third, there is evidence of support for Dim's actions toward Anthony-Thomas by his immediate supervisors and disagreement with Manning's decision to terminate his employment. Additionally, even when finding out that Anthony-Thomas chose to end the relationship with Huntington, Manning praised Dim's work on the account using the phrase "mission accomplished." This praise tends to contradict Manning's contention that he had concerns with the way Dim was interacting with Anthony-Thomas even prior to Zanetos' complaint.

All of the above-cited evidence, coupled with: 1) a factual dispute as to whether Dim was given a warning regarding his interactions with customers prior to starting work at Huntington; 2) Dim's excellent performance reviews and receipt of performance bonuses; 3) the lack of discipline for Opie when a customer complaint was received about his actions; and 4) the fact that Dim was immediately terminated rather than subjected to a lesser form of punishment, could

lead a reasonable jury to conclude that Manning's articulated reasons for terminating Dim were insufficient to support that decision, and thus were merely a pretext for discrimination.

Huntington cites the so-called "honest belief rule," arguing that whether Dim was actually given the warning from Harris is irrelevant to the question of pretext, so long as Manning honestly believed that Dim had been warned. The Sixth Circuit has stated that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect." *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001). The Court, however, is unprepared to invoke the honest-belief rule on the facts before it. First, the Sixth Circuit has noted that the application of the rule "is not automatic" as "once the employer is able to point to the particularized facts that motivated its decision, the employee has the opportunity to produce proof to the contrary." *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998). As noted above, there is ample evidence from which a reasonable jury could conclude that Manning's purported explanation is a pretext for discrimination. Further, the Court is not altogether persuaded of the applicability of the honest-belief rule to the warning that Manning allegedly directed Harris to give Dim. In this regard, customer complaints are the non-discriminatory reason given by Huntington for the adverse employment action taken against Dim, instead of the fact that he may have been warned about potential improper behavior toward customers. While the prior warning may have contributed to the severity of the adverse action taken, the honest-belief rule is more readily applicable in this context to the question of whether Manning actually believed that what the customers reported regarding Dim's behavior was true.

Accordingly, summary judgment as to Dim's claims for race and/or national origin based discrimination arising from the termination of his employment with Huntington is denied.[1]

## C.

Dim's claim for age discrimination is brought pursuant to the Age Discrimination in Employment Act, 29 U.S.C. § 621 *et seq.* ("ADEA"). ADEA claims based on indirect evidence are also analyzed using the *McDonnell-Douglas* paradigm. *See Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012). A plaintiff may establish a prima facie case of age discrimination by demonstrating "'(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *Id.* (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)).

In the instant case, Dim has failed to cite evidence supporting the fourth factor. While the Court has concluded that Opie is similarly situated to Dim and outside Dim's protected class in terms of race and/or national origin, Dim has cited no evidence regarding Opie's (or any other comparator's) age that would allow a reasonable jury to draw the inference that Dim's age motivated Manning's decision to terminate his employment. Accordingly, the Court grants summary judgment to Huntington as to Dim's claim for age discrimination, Count VI of the Amended Complaint.

## III.

For the above-stated reasons, Defendant the Huntington National Bank's Motion for Summary Judgment (Doc. 33) is **GRANTED in PART** and **DENIED in PART**. Summary judgment is denied as to Plaintiff Green Dim's claims for race and/or national origin

---

[1] Nothing in the Court's decision should be construed as barring Dim from pursuing a "mixed-motive" theory of discrimination pursuant to 42 U.S.C. § 2000e-2(m) at trial.

discrimination arising from the termination of his employment with Huntington. Summary judgment is granted to Huntington as to Dim's remaining claims.

**IT IS SO ORDERED.**

UNITED STATES DISTRICT JUDGE